# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATHANIEL P. REED, *et al.*, | |
|     Plaintiffs, | |
|     v. | |
| KEN SALAZAR, in his official capacity as Secretary of the Interior, *et al.* | Civil Action No. 08-2117 (CKK) |
|     Defendants, | |
| CONFEDERATED SALISH & KOOTENAI TRIBES, | |
|     Intervenor-Defendant. | |

| | |
|---|---|
| BLUE GOOSE ALLIANCE, *et al.*, | |
|     Plaintiffs, | |
|     v. | |
| KEN SALAZAR, in his official capacity as Secretary of the Interior, *et al.*, | Civil Action No. 09-640 (CKK) |
|     Defendants, | |
| CONFEDERATED SALISH & KOOTENAI TRIBES, | |
|     Intervenor-Defendant. | |

## MEMORANDUM OPINION
(September 28, 2010)

The above-captioned cases involve a challenge to an annual funding agreement entered into between the U.S. Department of Interior Fish & Wildlife Service ("FWS") and the Confederated Salish & Kootenai Tribes of the Flathead Reservation (the "CSKT") for the operation and management of the National Bison Range Complex, a part of the National Wildlife

Refuge System. In the first action, Plaintiffs Nathaniel P. Reed, David S. Wiseman, Jon

Malcolm, Marvin R. Kaschke, Joseph P. Mazzoni, Marvin L. Plenert, Robert C. Fields, Florence

M. Lariveriere, Delbert Dee Palmer, and Public Employees for Environmental Responsibility

(collectively, the "*Reed* Plaintiffs") contend that the annual funding agreement violates the

National Wildlife Refuge System Administration Act of 1966, as amended (the "Refuge Act"),

16 U.S.C. §§ 668dd-668ee; the Indian Self-Determination and Education Assistance Act

("ISDEAA"), 25 U.S.C. §§ 450 *et seq.*, as amended by the Tribal Self-Governance Act of 1994,

25 U.S.C. §§ 458aa-hh; the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552; and the

Intergovernmental Personnel Act ("IPA"), 5 U.S.C. §§ 3371-76. The *Reed* Plaintiffs also

contend that Defendants Ken Salazar and Rowan W. Gould, sued in their official capacities as

Secretary of the Interior and Acting Director of FWS, respectively (collectively, "Defendants")

violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, by failing

to prepare an environmental impact statement or other documents required by NEPA prior to

entering an agreement with the CSKT. In the second action, Plaintiffs Blue Goose Alliance, Don

Redfearn, Evelyn Redfearn, William C. Reffalt, and Christine Enright-Reffalt (collectively, the

"*Blue Goose* Plaintiffs") also contend that the funding agreement with the CSKT violates the

Refuge Act, the ISDEAA, and the FOIA. The *Blue Goose* Plaintiffs also contend that

Defendants failed to comply with NEPA and the Endangered Species Act ("ESA"), 16 U.S.C.

§§ 1531-44. Plaintiffs in both actions (collectively, "Plaintiffs") seek a rescission of the funding

agreement. The Court granted the CSKT's motion to intervene as a defendant in these actions.

Presently pending before the Court are cross-motions for summary judgment that have

been filed by the Plaintiffs, Defendants, and the CSKT as Intervenor-Defendant. For the reasons

explained below, the Court finds that Defendants failed to comply with their obligations under

NEPA before entering into the annual funding agreement with the CSKT to manage the NBRC.

Accordingly, the Court shall grant Plaintiffs' motions for summary judgment with respect to their

NEPA claims, deny Defendants' and Intervenor-Defendant's motions for summary judgment

with respect to NEPA claims, and order that the annual funding agreement be set aside. In light

of this disposition of the Plaintiffs' NEPA claims, the Court shall deny without prejudice the

parties' motions for summary judgment with respect to their other claims.

## I. BACKGROUND

*A.*      *Statutory Background*

     1.      <u>The National Wildlife Refuge System Administration Act</u>

Originally enacted in 1966, the National Wildlife Refuge System Administration Act

("Refuge Act") sets forth the guiding principles and policies for the administration and

management of the National Wildlife Refuge System ("NWRS"). The Refuge Act designates the

NWRS as all lands, waters, and interests managed by the Secretary of the Interior "for the

conservation of fish and wildlife, including species that are threatened with extinction." 16

U.S.C. § 668dd(a)(1). As amended in 1976, the Refuge Act states that the NWRS "shall be

administered by the Secretary [of the Interior] through the United States Fish and Wildlife

Service." *Id.*; *see* Pub. L. No. 94-223, 90 Stat. 199 (1976). Congress further amended the

Refuge Act in 1997, clarifying that "[t]he mission of the System is to administer a national

network of lands and waters for the conservation, management, and where appropriate,

restoration of the fish, wildlife, and plant resources and their habitats within the United States for

the benefit of present and future generations of Americans." National Wildlife Refuge System

Improvement Act of 1997 § 4, 16 U.S.C. § 668dd(a)(2). The Refuge Act states that "each refuge shall be managed to fulfill the mission of the System, as well as the specific purposes for which that refuge was established." 16 U.S.C. § 668dd(a)(3)(A).

2.     The Indian Self-Determination Education & Assistance Act

Originally enacted in 1975, the Indian Self-Determination and Education Assistance Act ("ISDEAA") was intended to assure "maximum Indian participation in the direction of educational as well as other Federal services to Indian communities . . . ." 25 U.S.C. § 450a(a), Pub. L. No. 93-638, 88 Stat. 2203 (1975). The Act authorizes the Secretary of the Interior to enter into contracts with Indian tribes to have them perform programs, functions, services, or activities, including administrative functions, that would otherwise be performed by DOI for the benefit of Indians. 25 U.S.C. § 450f(a)(1). In 1994, Congress passed the Tribal Self-Governance Act, which amended the ISDEAA and authorized the Secretary to enter into annual funding agreements to transfer control of programs, services, functions, and activities that are of special geographic, historical, or cultural significance to the participating tribe. 25 U.S.C. § 458cc(c), Pub. L. No. 103-413 § 204, 108 Stat. 4250, 4272 (1994). As amended, the ISDEAA contains the following disclaimer:

> Nothing in this section [25 U.S.C. § 458cc] is intended or shall be construed to expand or alter existing statutory authorities in the Secretary so as to authorize the Secretary to enter into any agreement under subsection (b)(2) of this section and section 458ee(c)(1) of this title with respect to functions that are inherently Federal or where the statute establishing the existing program does not authorize the type of participation sought by the tribe: *Provided*, however an Indian tribe or tribes need not be identified in the authorizing statute in order for a program or element of a program to be included in a compact under subsection (b)(2) of this section.

25 U.S.C. § 458cc(k). The ISDEAA regulations also clarify that this section excludes

"inherently Federal functions" from the scope of permissible programs in an annual funding agreement. *See* 25 C.F.R. § 1000.129.

3.      The National Environmental Policy Act

The National Environmental Policy Act is the "basic national charter for protection of the environment," 40 C.F.R. § 1500.1(a), and it requires federal agencies to take a "hard look" at the environmental consequences of their projects *before* taking action.  42 U.S.C. § 4332(C); *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 374 (1989).  NEPA "requires that agencies assess the environmental consequences of federal projects by following certain procedures during the decision-making process."  *City of Alexandria v. Slater*, 198 F.3d 862, 866 (D.C. Cir. 1999).

NEPA has twin aims.  "First, it 'places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action.'"  *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978)).  "Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process."  *Id.*  Accordingly, NEPA's mandate "is essentially procedural." *Vermont Yankee*, 435 U.S. at 558; *N. Slope Borough v. Andrus*, 642 F.2d 589, 599 (D.C. Cir. 1980) (explaining that NEPA requirements are essentially procedural and a court should not substitute its own policy judgment for that of the agency).  "NEPA merely prohibits uninformed—rather than unwise—agency action."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989).

"The major 'action-forcing' provision of NEPA is the requirement that 'all agencies of the Federal government' prepare a detailed environmental analysis for 'major Federal actions

5

significantly affecting the quality of the human environment.'" *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 146 (D.C. Cir. 1985) (quoting 42 U.S.C. § 4332(C); S. Rep. No. 91-296, 91st Cong., 1st Sess. 19 (1969)). This analysis is called an Environmental Impact Statement ("EIS"). *See* 42 U.S.C. § 4332(C).

An EIS is not required if the agency makes a determination based on a more limited document, an Environmental Assessment ("EA"), that the proposed action would not have a significant impact on the environment. *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 81 (D.D.C. 2006) (citing 40 C.F.R. §§ 1501.4, 1508.13). "The EA is to be a 'concise public document' that '[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS].'" *Dep't of Transp. v. Pub. Citizen,* 541 U.S. 752, 757 (2004) (quoting 40 C.F.R. § 1508.9(a)). "If, pursuant to the EA, an agency determines that an EIS is not required under applicable [regulations issued by the Council on Environmental Quality], it must issue a 'finding of no significant impact' (FONSI), which briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment." *Id.* at 757-58 (citing 40 C.F.R. §§ 1501.4(e), 1508.13).

Of particular significance to the present litigation, an agency need not prepare an EIS or even an EA if it finds that its proposed action is subject to a "categorical exclusion." A "categorical exclusion" is defined as:

> a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. An agency may decide in its procedures or otherwise, to prepare environmental assessments for the reasons stated in § 1508.9 even though it is not required to do so. Any procedures under this section shall

provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

40 C.F.R. § 1508.4.  The terms within this definition are defined broadly.  A "cumulative impact" is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions."  *Id.* § 1508.7.  The term "effects" not only includes direct effects (those "caused by the action and occur at the same time and place"), but also indirect effects (those "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable").  *Id.* § 1508.8.  Moreover, the type of "effects" that are contemplated by this definition include:

> ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative.  Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

*Id.*

When an agency finds that its proposed action falls within a categorical exclusion, the agency must then determine whether there are any "[e]xtraordinary circumstances" that nevertheless require the agency to perform an environmental evaluation.  40 C.F.R. § 1508.4; 43 C.F.R. § 46.215.  Pursuant to regulations promulgated by the Department of the Interior ("DOI"), extraordinary circumstances exist for individual actions within categorical exclusions that may meet any of the following criteria:

> (a) Have significant impacts on public health or safety.

> (b) Have significant impacts on . . . park, recreation or refuge lands . . . .

(c) Have highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources . . . .

(d) Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks.

(e) Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects.

(f) Have a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects.
. . .
(h) Have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species or have significant impacts on designated Critical Habitat for these species.

. . .

(l) Contribute to the introduction, continued existence, or spread of noxious weeds or non-native invasive species known to occur in the area or actions that may promote the introduction, growth, or expansion of the range of such species . . . .

*Id.* § 46.215.[1]

Agencies must comply with the procedural requirements of NEPA, and the decision to forego production of an EIS or EA in favor of a categorical exclusion is subject to judicial review under the arbitrary and capricious standard of review. *Nat'l Trust for Historic Pres. v. Dole*, 828 F.2d 776, 781 (D.C. Cir. 1987); *Back Country Horsemen of Am. v. Johanns*, 424 F. Supp. 2d 89, 98 (D.D.C. 2006).

---

[1] These regulations, which codified procedures in the DOI's Departmental Manual, became effective in October 2008. *See* 73 Fed. Reg. 61292 (Oct. 15, 2008). Prior to that time, DOI policy required FWS to review any action that is subject to a categorical exclusion to determine whether extraordinary circumstances are present that would require further review for environmental impact. *See* NEPA Revised Implementing Procedures, 69 Fed. Reg. 10866, 10876 (Mar. 8, 2004). The list of extraordinary circumstances to be considered is substantially the same as those listed in 43 C.F.R. § 46.215. *See* 69 Fed. Reg. at 10878.

4.     <u>The Endangered Species Act</u>

The Endangered Species Act ("ESA") establishes a comprehensive federal program to limit the number of fish, wildlife, and plant species rendered extinct as a consequence of their interactions with mankind. The ESA requires that each federal agency consult with FWS or the National Marine Fisheries Service to ensure that any action authorized, funded, or carried out by that agency is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of critical habitat for such species. 16 U.S.C. § 1536(a)(2). Where FWS is the acting agency, it must conduct an intra-agency consultation. *Id.* Under the ESA and its implementing regulations, a federal agency must engage in formal consultation with the Services if an action undertaken by that agency "may affect" an endangered or threatened species or its critical habitat. 50 C.F.R. § 402.14(a).

B.     *Factual Background*

The National Bison Range Complex ("NBRC") is a part of the National Wildlife Refuge System located in Montana that includes the National Bison Range, Swan Lake, Lost Trail, Pablo, and Ninepipe National Wildlife Refuges, as well as the Northwest Montana Wetland Management District in Lake County, Montana. *See* Admin. Record ("AR") 887SUPII (5/8/2007 Chronology and Plan for National Bison Range). The National Bison Range, along with the Ninepipe and Pablo National Wildlife Refuges, lies entirely within the Flathead Reservation, home to the Confederated Salish & Kootenai Tribes ("CSKT"). The National Bison Range was established in 1908 by President Theodore Roosevelt to conserve the American bison, and bison were reestablished at the refuge after their numbers had dwindled to fewer than 100 in the wild. AR 887SUPII. The NBRC is also home to a variety of species such as elk, mountain goats,

bighorn sheep, pronghorn antelope, and migratory birds. *Id.*

      1.      The 2005 AFA

On April 23, 2003, the CSKT submitted a letter to the Secretary of the Interior expressing

their interest in negotiating an annual funding agreement ("AFA") pursuant to the ISDEAA for

the operation and management of the National Bison Range and ancillary properties on the

Flathead Reservation. AR 510-13 (2/26/2003 Letter of Interest); AR 1958-59 (6/30/2004

Briefing Statement).[2] FWS began negotiations with the CSKT in the summer of 2003. AR

887SUPII; *see* Notice, 70 Fed. Reg. 5205 (Feb. 1, 2005). The parties exchanged draft

agreements during the fall of 2003 but had not reached an agreement by spring of 2004 and

reached out to DOI officials to assist the negotiations. AR 1958-59. In June 2004, DOI

transmitted a revised draft AFA and indicated that progress could move forward. *Id.* The parties

submitted the draft AFA for public comment and announced the public comment period in the

*Federal Register*. *See* 69 Fed. Reg. 42199 (July 14, 2004). On December 15, 2004, the parties

signed the Fiscal Years 2005-2006 Annual Funding Agreement Between the United States Fish

and Wildlife Service and the Confederated Salish and Kootenai Tribes of the Flathead

Reservation ("2005 AFA"). AR 2685-98 (2005 AFA). Following a congressional review period,

the 2005 AFA became effective on March 15, 2005.

The 2005 AFA called for the CSKT to perform activities in five general categories:

Management, Biological Program (including habitat management), Fire Program, Maintenance

Program, and Visitor Services. AR 2642. The CSKT was responsible for the activities identified

---

[2] The letter of interest is dated February 26, 2003, but apparently was not transmitted to
the Secretary of the Interior until April 2003. *See* AR 1958.

in the AFA, subject to the final authority of the FWS Refuge Manager. AR 2643. On March 1, 2006, FWS's Project Leader for the NBRC, Steven Kallin, compiled a report on the CSKT's implementation of the AFA in 2005. *See* AR 1132-1272 (Calendar Year 2005 Report on Implementation of AFA at NBRC). FWS found that in 2005, under the previous AFA, only 41% of the activities performed by the CSKT under the AFA were rated as successful. AR 1137. In the Biology Program, 9 out of 26 required activities were rated as unsuccessful, with 6 more rated as "needs improvement." *Id.* at 1138. FWS found that some activities were not initiated in a timely manner and some were not performed by qualified personnel. *Id.* In the Fire Program, FWS found that only one of three required prescribed burns was completed, due in part to poor planning. *Id.* at 1139. In the Maintenance Program, FWS found that "[s]everal of the highest priority Activities, such as those that influence public health and long-term maintenance of vehicles and heavy equipment, were not completed at a satisfactory level." *Id.* at 1139.

The CSKT continued operations under the AFA in 2006. On April 27, 2006, the Project Leader issued a memorandum complaining about the CSKT's failure to maintain fences, indicating that "lack of fence maintenance has compromised our ability to manage both the bison herd and habitat according to planned management strategies, and will complicate any future attempts to evaluate the results of our habitat management efforts." AR 934SUPII (4/27/2006 Memorandum). Although the term of the 2005 AFA expired at the end of Fiscal Year 2006 in September 2006, FWS authorized the CSKT to continue operations under the AFA into Fiscal Year 2007 pending completion of negotiations for a future AFA. *See* AR 738SUPII (9/5/2006 Letter from FWS Deputy Regional Director to the CSKT). On September 19, 2006, seven FWS employees filed an informal grievance with the FWS Regional Director alleging that a hostile

work environment had existed at the NBRC since the AFA commenced in 2005. *See* AR 2356. Following an investigation, the FWS Regional Director concluded that "a chronic and pervasive workplace problem of considerable magnitude existed at the NBR." AR 2353 (12/6/2006 Memorandum). On December 5, 2006, the Project Leader made a formal request to have FWS reassume bison feeding activities from the CSKT, citing underfeeding. AR 2340-41 (12/5/2006 Memorandum). On December 6, the Regional Director requested the termination of the CSKT's authority to continue operating under the 2005 AFA and an end to negotiations toward an AFA for Fiscal Year 2007. AR 2353. The recommendation was based on the CSKT's failure to maintain a safe and fair working environment as well as poor performance by the CSKT. AR 2353-54. The Regional Director noted that "the CSKT performance under the AFA was not at an acceptable level for their first year and has not made significant improvement in spite of significant input and assistance from the Service." AR 2354.

On December 11, 2006, FWS formally notified the CSKT that it was withdrawing the CSKT's authority to extend performance under the 2005 AFA and terminating negotiations for a Fiscal Year 2007 AFA. AR 2429-39 (12/11/2006 Memorandum). The reasons given for the termination included the CSKT's failure to comply with bison management standards, failure to meet FWS wildlife monitoring and reporting standards, failure to complete biological study plans, and failure to timely and properly maintain vehicles, equipment, and property. AR 2432. The termination memorandum also cited the unacceptable workplace environment at the NBRC and unsafe conditions for employees and the public. AR 2433. In his report on the CSKT's performance in calendar year 2006, the NBRC Project Leader found that several of the highest priority activities in the Maintenance Program were not completed at a satisfactory level,

including those that influence wildlife health and safety, habitat management and the long-term maintenance of vehicles, equipment and infrastructure, interior fence maintenance, and bison husbandry. *See* AR 2517-2634 (Calendar Year 2006 Report on Implementation of AFA at NBRC). He also found that the CSKT had failed to maintain electric fences at proper voltage, allowing bison to escape from a grazing unit and resulting in the death of one bison cow who was attacked by other bison while entangled in the fence. *See* AR 2610-11. He found that the CSKT had significantly underfed 64 surplus bison that were being confined pending transfer to other NWRS units in October-December 2006. *See* AR 2618-33 (2006 Report, Addendum C). According to the Project Leader, the CSKT's underfeeding of bison "clearly justified the need for the FWS to cancel the CSKT's bison feeding responsibility, and feed these bison using FWS staff, in order to properly prepare these bison for the stress of their pending relocation." *Id.* at 2632-33.

On January 7, 2007, the CSKT pursued an appeal of FWS's decision to terminate the AFA and cancel negotiations before the Board of Indian Appeals. *See* AR 24-31 (Notice of Appeal and Statement of Reasons). The CSKT contended that FWS had improperly terminated the AFA without prior notice to the CSKT and that FWS had not notified the CSKT of alleged deficiencies and given them an opportunity to respond to them. AR 26. Some individuals also criticized the FWS Project Leader and other FWS staff for being hostile towards the CSKT. *See, e.g.*, AR 2463-66 (12/15/2006 Statement by Paul Bishop). The CSKT also issued a detailed response to the allegations of poor performance in the FWS's evaluation for calendar year 2006. *See* AR 1826-1945 (Response to CY-2006 Preliminary Performance and Evaluation Summary).

13

2. <u>The 2008 AFA</u>

Following the termination of the first AFA, Deputy Secretary of the Interior Lynn Scarlett wrote a Memorandum to officials at FWS and the Bureau of Indian Affairs expressing disappointment with the way the first AFA was terminated. *See* AR 2511-15 (12/29/06 Memorandum). Deputy Secretary Scarlett indicated that the termination of the AFA would remain in place but that DOI officials would immediately reestablish a working relationship with the CSKT to include authorization of a new AFA for Fiscal Year 2007 that would be substantially the same as the prior AFA. AR 2514. The CSKT submitted a proposed draft AFA in May 2007, but the parties' negotiations stalled. On November 26, 2007, Assistant Secretary for Fish and Wildlife and Parks Lyle Laverty issued an "action plan" to restart negotiations with a third-party neutral facilitator. *See* AR 2224-57 (11/26/2007 Memorandum). Negotiations began in January 2008, resulting in the parties' signing on June 19, 2008, the "Fiscal Years 2009-2011 Annual Funding Agreement between the United States Department of the Interior Fish and Wildlife Service and the Confederated Salish and Kootenai Tribes of the Flathead Reservation" ("2008 AFA"). AR 2699-2761 (2008 AFA). The 2008 AFA became effective January 1, 2009 and expires on September 30, 2011.

The 2008 AFA provides for the CSKT to be more involved in the management of the NBRC than under the 2005 AFA. The terms of the AFA[3] "recognize and formalize the partnership between the Service and the CSKT in operating and maintaining all programs of the NBRC." AFA § 2(A). The AFA provides that the parties will collaborate in the management of the NBRC through the "Refuge Leadership Team," comprised of two FWS officials and two

_____

[3] Unless otherwise specified, all references to "the AFA" are to the 2008 AFA.

CSKT officials, subject to the final authority of the FWS Refuge Manager. AFA § 7(D). The

AFA provides that FWS may reassume responsibility for any activities for which the CSKT are

responsible in the event that the FWS Director finds, and notifies the CSKT in writing, that the

performance of the CSKT is causing imminent jeopardy to natural resources or public health and

safety. AFA § 17(C).

3.    <u>NEPA Compliance</u>

Prior to the adoption of the 2005 AFA, FWS officials took steps to ensure compliance

with NEPA. On August 31, 2004, FWS's Assistant Regional Director for NWRS Region 6,

Richard Coleman, signed three documents relating to the AFA's compliance with NEPA and

other environmental laws. *See* AR 2099-2106 (9/7/2004 Memorandum from FWS Regional

Director, Region 6). The first document, a "Statement of Compliance for Programmatic

Categorical Exclusion at the National Bison Range," states that a series of executive orders and

legislative acts, including the ESA, were reviewed with respect to the 2005 AFA. *See* AR 2100-

01. The second document is an "Environmental Action Memorandum" expressing Mr.

Coleman's determination that the 2005 AFA is a categorical exclusion as provided by 516 DM[4]

6, Appendix 1, with no further documentation required. *See* AR 2102. The third document is

FWS's formal invocation of a categorical exclusion. *See* AR 2103-06. The document briefly

describes the terms of the 2005 AFA as well as the mission of the NBRC and the estimated cost

of the proposed action. *Id.* at 2103-05. The document contemplates that "subsequent AFAs"

may include additional activities and states that FWS will negotiate in good faith with the CSKT

---

[4] Citations to "DM" are to DOI's Departmental Manual, available at http://elips.doi.gov. Changes to the Departmental Manual are published in the *Federal Register*.

to explore these opportunities.  AR 2105.  The document then states, in pertinent part:

> The proposed action will have no significant adverse effect on the quality of the human environment.  The Programmatic agreement between the [FWS] and the [CSKT] qualifies as a Categorical Exclusion under 516 DM 6 Appendix 1.4, (B1) research, inventory, and information collection activities directly related to the conservation of fish and wildlife resources which involve negligible animal mortality or habitat destruction, no introduction of contaminants, or no introduction of organisms not indigenous to the affected ecosystem; and (B2) the operation, maintenance, and management of existing facilities and routine recurring management activities and improvements, including renovations and replacements which result in only minor changes in the use, and have negligible environmental effects on-site or in the vicinity of the site; and (B4) the use of prescribed burning for habitat improvement purposes, when conducted in accordance with local and State ordinance and laws.

AR 2106; *see also* 516 DM 8.5(B), 65 Fed. Reg. 52212, 52225 (Aug. 28, 2000) (describing categorical exclusions).  Based on this analysis, Mr. Coleman states that "[i]t is recommended the [FWS] conduct the proposed action and fulfill the agreement of the AFA."  AR 2106.

Following public comment on the proposed AFA, FWS responded to concerns that the AFA was precedent-setting for the NBRC and the NWRS and that the Categorical Exclusion prepared by FWS was insufficient to address this precedent.  *See* Notice, 70 Fed. Reg. 5205, 5207 (Feb. 1, 2005).  The agency stated:

> The Service does not believe the Agreement is a major Federal action that will result in significant environmental impacts.  The Service consider the work that is identified in the Agreement to be part of the routine operations, maintenance, and management of the National Bison Range Complex (whether done by Service employees, CSKT employees, or another contractor).  The Service has found that routine operation, maintenance, and management activities do not (individually or cumulatively) have a significant effect on the human environment and are, therefore, categorically excluded from NEPA compliance (516 DM 6).

70 Fed. Reg. 5207.

In April 2007, the DOI's Office of the Solicitor issued a memorandum reviewing, *inter*

*alia*, the NEPA requirements for a new proposed AFA with the CSKT for fiscal years 2007-08.

*See* AR 960SUPII-998SUPII (4/20/2007 Memorandum).  That memorandum states in pertinent

part:

> 1.  **Does NEPA apply to the AFA?**  When the 2005-2006 AFA became effective,
> the FWS determined that NEPA did not apply because the AFA was within the
> terms of a categorical exclusion.  The result holds for the current AFA as well.

AR 962SUPII.

In early 2008, Congressman John D. Dingell inquired about the proposed AFA and asked

whether NEPA applied to the action.  In a draft response to the inquiry, a DOI official wrote,

"NEPA does not apply to the AFA process.  FWS responded to this with great specificity in the

final AFA notice in the Fed Reg in 2005."  AR 867SUPI (2/28/2008 Email from Janet Roell

Naughton).  On April 11, 2008, a final response letter was written to Congressman Dingell by

Lyle Laverty, Assistant Secretary for Fish and Wildlife and Parks.  *See* AR 906-09 (4/11/2008

Letter from Lyle Laverty to the Hon. John D. Dingell).  The letter states in pertinent part:

> 1) Does the NEPA process apply to the AFA process?  If not, why?
>
> A.  No, NEPA does not apply to the award of an AFA, as the award itself is not a
> major federal action that will result in significant environmental impacts.  As to the
> activities to be conducted under the AFA, the U.S. Fish and Wildlife Service
> (Service) considers the work itself to be part of the routine operations, maintenance,
> and management of the National Bison Range Complex (whether done by Service
> employees, CSKT employees, or another contractor).  The Service has found that
> routine operation, maintenance, and management activities do not (individually or
> cumulatively) have a significant effect on the human environment and are, therefore,
> categorically excluded from NEPA compliance.

AR 907.  This is the only evidence in the record relating to the NEPA review for the 2008 AFA.

## II.  LEGAL STANDARDS

*A.        Summary Judgment Under Federal Rule of Civil Procedure 56*

The parties have filed cross motions for summary judgment pursuant to Federal Rule of

Civil Procedure 56.  Summary judgment is proper when "the pleadings, the discovery [if any]

and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(c).  Under the summary judgment standard, the moving party bears the "initial responsibility

of informing the district court of the basis for its motion, and identifying those portions of the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  In

response, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by

the depositions, answers to interrogatories, and admissions on file, designate specific facts

showing that there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks omitted).  All

underlying facts and inferences are analyzed in the light most favorable to the non-moving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Where there are no disputed facts

and review is based solely on the administrative record, summary judgment is appropriate for the

party entitled to judgment as a matter of law.  *Young v. Gen. Servs. Admin.*, 99 F. Supp. 2d 59, 65

(D.D.C.), *aff'd*, 11 F. App'x 3 (D.C. Cir. 2000).

*B.        Administrative Procedure Act*

Although the Plaintiffs have asserted violations of various federal statutes, their causes of

action are based on the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*  Under the

APA, the Court sets aside an agency action that is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706. Compliance with NEPA, as well as its procedures related to environmental evaluations, are properly analyzed under the "arbitrary and capricious standard." *Nat'l Trust for Historic Pres. v. Dole*, 828 F.2d 776, 781 (D.C. Cir. 1987). The scope of review under this standard is well-established:

> the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. In reviewing that explanation, [the court] must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment . . . Normally, an agency rule would be arbitrary and capricious if the agency has relied on facts which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citations and internal quotations omitted). This standard of review is deferential to the agency, and the Court is not entitled to substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Nevertheless, while deferential, "courts are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Nat'l Labor Relations Bd. v. Brown*, 380 U.S. 278, 290 (1965). *See also McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004) (holding that the "Court will not defer to the agency's conclusory or unsupported assertions").

# III. DISCUSSION

Plaintiffs in these actions assert a variety of claims challenging Defendants' decision to enter into the AFA with the CSKT. First, Plaintiffs contend that the AFA violates the Refuge Act because it delegates the authority to administer the NBRC to an entity other than the FWS. Second, Plaintiffs contend that the AFA exceeds the scope of authority for annual funding agreements under the ISDEAA by transferring "inherently Federal functions" to the CSKT. Third, Plaintiffs contend that the AFA violates FOIA because it exempts from disclosure certain records maintained by the CSKT. Fourth, the *Reed* Plaintiffs contend that the AFA violates the Intergovernmental Personnel Act by failing to provide certain protections for federal employees assigned to work for the CSKT. Fifth, Plaintiffs contend that Defendants violated NEPA by failing to conduct a sufficient assessment of the AFA's potential environmental impacts. Sixth, the *Blue Goose* Plaintiffs contend that Defendants violated the ESA by failing to conduct an assessment of the AFA's potential impact on endangered species. Defendants and the CSKT dispute these claims and argue that Plaintiffs lack standing to bring these challenges. The Court shall address the threshold issue of standing before turning to Plaintiffs' claims on the merits.

### A. Standing and Jurisdiction

Defendants and the CSKT argue that Plaintiffs in both actions lack standing to assert their claims. Because standing to sue is an essential element of the case-or-controversy requirement of Article III of the United States Constitution, standing is a jurisdictional issue that must be resolved as a threshold matter. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The elements of standing are well-established. To establish the "irreducible constitutional minimum of standing," a plaintiff must show: (1) that it has suffered an injury in fact, which is the invasion

of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there is a causal connection between the injury and the conduct at issue, such that the injury is fairly traceable to the challenged act; and (3) that it is likely, as opposed to speculative, that the injury will be redressed by a favorable decision. *Id.* at 560-61. Plaintiffs bear the burden of demonstrating that they have standing. *See id.* at 561 ("The party invoking federal jurisdiction bears the burden of establishing the[] elements [of standing].") Plaintiffs need not show that each plaintiff has standing to assert every claim; if, for each claim, "standing can be shown for at least one plaintiff, [the court] need not consider the standing of the other plaintiffs to raise that claim." *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996). "An organization has representational standing to litigate on behalf of its members if (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Commuter Rail Div. of Regional Transp. Auth. v. Surface Trasnp. Bd.*, 608 F.3d 24, 30 (D.C. Cir. 2010) (quotation marks and citations omitted). Alternatively, an organization may have standing to sue in its own right if the organization itself has suffered an injury in fact. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982). "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Defenders of Wildlife*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)). The Court shall examine the parties' asserted injuries with

respect to their claims.[5]

1.    Standing by the *Reed* Plaintiffs

Defendants and the CSKT argue that the *Reed* Plaintiffs lack standing to challenge the

AFA's delegation of authority to the CSKT because they do not have any concrete or

particularized injuries relating to the CSKT's management of the NBRC.  In environmental cases

such as this one, plaintiffs usually establish injury in fact by showing that they have recreational

or aesthetic interests in particular land that will be adversely affected by the challenged actions.

*See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000)

("We have held that environmental plaintiffs adequately allege injury in fact when they aver that

they use the affected area and are persons 'for whom the aesthetic and recreational values of the

area will be lessened' by the challenged activity." (quoting *Sierra Club v. Morton*, 405 U.S. 727,

735 (1972)).  To establish that injury is imminent, plaintiffs must show more than a vague desire

to visit the land at issue: "such 'some day' intentions—without any description of concrete plans,

or indeed any specification of *when* the some day will be—do not support a finding of the 'actual

or imminent' injury that our cases require."  *Defenders of Wildlife*, 504 U.S. at 564; *see also*

*Summers v. Earth Island Institute*, 129 S. Ct. 1142, 1151 (2009) (rejecting as insufficient

plaintiff's statement that he has visited many National Forests and plans to visit more in the

future).

In his supplemental declaration attached to the *Reed* Plaintiffs' reply brief, Plaintiff David

Wiseman, the Refuge Manager/Project Leader for the NBRC from 1995 to 2004, avers that he

---

[5] Because the Court finds that it need only reach Plaintiffs' NEPA claims, the Court shall
not address whether Plaintiffs have standing to bring their other claims for relief.

has made periodic visits to the NBRC each and every year since he last worked there, most recently visiting in June 2009. *See Reed* Pls.' Reply, Ex. A (Supp. Decl. of David Wiseman). Plaintiff Wiseman also declared (on February 16, 2010) that "[f]uture plans to visit the NBRC include June of 2010 and October of 2010." *Id.* Plaintiff Wiseman's supplemental declaration is similar to one mentioned by the Supreme Court in *Summers v. Earth Island Institute*, 129 S. Ct. 1142 (2009). In *Summers*, the Court referenced an affidavit submitted by a member of the plaintiff organization averring that he had repeatedly visited the Burnt Ridge site in the Sequoia National Forest, that he had imminent plans to do so again, and that his interests in viewing the flora and fauna of the area would be harmed if the challenged project went forward without the government providing him an opportunity to comment. *See* 129 S. Ct. at 1149. The government conceded in *Summers* that such an affidavit was sufficient to confer standing. *Id.* Here, however, Defendants argue that Wiseman's declaration is insufficient because (1) it is possible to infer that the "[f]uture plans to visit" are someone else's plans, not his; (2) the future plans to visit are not "concrete," and (3) the declaration does not establish Wiseman's intentions as of December 2008 when the suit was filed. The Court is not persuaded by these arguments. The only logical interpretation of Wiseman's declaration is that he had plans to visit the NBRC in both June and October 2010, and those plans are consistent with Wiseman's statements that he makes periodic visits to NBRC at least annually. Although he may not have formed the intent to make those specific trips as of December 2008, the clear import of his declarations is that he had a continuing intent to visit regularly by that time, as demonstrated by his visit to the NBRC in June 2009. The Court finds that Plaintiff Wiseman's plans to visit the NBRC are more than the mere "some day" intentions that are insufficient to establish an injury in fact.

23

In addition, Plaintiff Delbert Dee "Skip" Palmer lives on a farm eight miles from the NBRC and avers that his ranch is contiguous with the Ninepipe National Wildlife Refuge, which is part of the NBRC. *See Reed* Pls.' Reply, Ex. B (Supp. Decl. of Delbert Dee "Skip" Palmer) ¶¶ 6-7. Plaintiff Palmer avers that he frequently visits or drives by Ninepipe and that he visits the Bison Range at least once a month. *Id.* ¶ 8. He claims that under the AFA, fences have not been maintained and weeds have been mismanaged, causing the health and beauty of the range to decline and thereby reducing his enjoyment of it. *See id.* ¶ 7. This declaration is sufficient to establish injury in fact for purposes of standing. *See, e.g.*, *Friends of the Earth*, 528 U.S. at 181-83 (finding that plaintiffs who lived near wastewater treatment plant established standing through testimony their enjoyment of the area was diminished by pollution).

Defendants and the CSKT argue that these injuries are too speculative because they are based on the unreasonable assumption that the CSKT will grossly mismanage the NBRC to the detriment of the bison and visitors to the NBRC. The Court has a duty to reject allegations of injury that are "overly speculative." *See United Transp. Union v. ICC*, 891 F.2d 908, 912 (D.C. Cir. 1989). However, when evaluating evidence concerning standing, the court must "assume that on the merits the plaintiffs would be successful in their claims." *Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1289 (D.C. Cir. 2007). Here, the Plaintiffs claim that handing over management of the NBRC to CSKT may have significant environmental consequences and that Defendants ignored or disregarded evidence in the record that the CSKT could not successfully manage the NBRC. These allegations are supported in part by statements in the Wiseman and Palmer declarations suggesting that the CSKT have failed to properly maintain fences and/or manage noxious weeds. Defendants attack the logic of concluding that

there is mismanagement by the CSKT based only on a small number of observations, but that is a dispute that goes to the merits of Plaintiffs' claims, not to the standing inquiry. Accordingly, the Court finds that the *Reed* Plaintiffs have sufficiently averred an injury in fact for purposes of standing.

The *Reed* Plaintiffs' injury can be causally traced to their claims that the AFA violates the Refuge Act and the ISDEAA, since without those violations, according to Plaintiffs' theory, the CSKT would not be managing the NBRC. Accordingly, their injury may be redressed by a favorable court decision rescinding the AFA. Similarly, their injury is causally connected to their NEPA claim, since the FWS might have decided not to implement the AFA had it conducted the environmental assessment that Plaintiffs believe was required. *See Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) ("When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant."); *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002) ("All that is necessary is to show that the procedural step was connected to the substantive result."). Therefore, the *Reed* Plaintiffs have standing to assert their claims that the AFA violates the Refuge Act and the ISDEAA and that Defendants violated NEPA.

2.    Standing by the *Blue Goose* Plaintiffs

As with the *Reed* Plaintiffs, Defendants argue that the *Blue Goose* Plaintiffs lack standing because, although they have some interest in the CSKT's alleged mismanagement of the NBRC, their asserted injuries are not concrete and particularized.

Several of the *Blue Goose* Plaintiffs provided declarations explaining their alleged

injuries.  Plaintiff Don E. Redfearn, a former FWS employee and current President of Blue

Goose Alliance, avers that he has a deep personal interest in the conservation of wildlife and

wildlife habitat at the NBRC that will be adversely affected if the CSKT performs as poorly

under the current AFA as it did previously.  *See Blue Goose* Complaint, Ex. A (Decl. of Don E.

Redfearn) ¶ 5.  He states that he has visited the NBRC "several times beginning in 1967 and

most recently on May 22-23, 2008" and that he "intend[s] to return to the NBRC in the future."

*Id.* ¶ 8.  Plaintiff William C. Reffalt, another former FWS official and current Vice President of

Blue Goose Alliance, avers that he has a similar interest in the conservation of bison at NBRC.

*See Blue Goose* Complaint, Ex. B (Decl. of William C. Reffalt) ¶ 11.  Plaintiff Reffalt states that

he and his wife visit national wildlife refuges whenever they travel and that they visited at least

35 refuges within the previous year (up to the date of his declaration, April 6, 2009), having

visited over 50 refuges in the western United States since 2006.  *Id.* ¶¶ 12-13.  He further states

that he has visited the NBRC three times since 2002 to gather historical information and

photograph the animals and that he too "intend[s] to return to the NBRC in the future."  *Id.* ¶ 15.

He also explains that he traveled at his own expense to Montana in January 2007 to make a

presentation to FWS and DOI officials about the previous AFA and the reasons for its failure.  *Id.*

¶ 16.

Defendants argue that these averments are insufficient to confer standing because they

fail to show a specific planned return date to the NBRC.  Defendants rely primarily on *Lujan v.*

*Defenders of Wildlife*, in which the Supreme Court found that the plaintiffs' stated desires to

return to endangered species habitat at unspecified times in the future did not give rise to an

"imminent" injury.  504 U.S. at 564.  Defendants also invoke *Summers v. Earth Island Institute*,

in which the Court held that a plaintiff's averment that he planned to visit several unnamed

National Forests in the future was not sufficient to demonstrate that he would likely be injured by

the challenged action. 129 S. Ct. at 1150. However, the declarations submitted by the *Blue*

*Goose* Plaintiffs provide substantially more evidence of an imminent injury than was before the

Court in either *Summers* or *Defenders of Wildlife*. In those cases, the plaintiffs had visited the

relevant sites only once in the past and had no particular plans to return to those sites. Here, by

contrast, Plaintiffs Redfearn and Reffalt have each visited the NBRC multiple times (including

recent visits) and professed an intent—more than a mere desire—to return. The fact that Reffalt

travels extensively to national wildlife refuge areas and has taken specific actions relating to the

NBRC is strong evidence that his intent to return to the NBRC will be realized in the near future,

taking his injury out of the realm of the conjectural and hypothetical. Accordingly, the Court

finds that at least one of the *Blue Goose* Plaintiffs has averred an injury in fact sufficient to

confer standing, and, for the same reasons as the *Reed* Plaintiffs, the Court finds that the *Blue*

*Goose* Plaintiffs have standing to assert their NEPA and ESA claims and claims that the AFA

violates the Refuge Act and the ISDEAA.

      B.    *Plaintiffs' NEPA Claims*

Plaintiffs argue that Defendants failed to comply with NEPA because they did not

conduct an environmental analysis of the 2008 AFA prior to its adoption. Defendants contend

that the AFA is covered by the "programmatic" categorical exclusion that was invoked in 2004

prior to the approval of the 2005 AFA, and therefore there was no need to conduct an

environmental assessment or an environmental impact statement for the 2008 AFA. Once a

categorical exclusion is established, "an agency's 'decision to classify a proposed action as

falling within a particular categorical exclusion will be set aside only if a court determines that the decision was arbitrary and capricious.'" *Back Country Horsemen v. Johanns*, 424 F. Supp. 2d 89, 99 (D.D.C. 2006) (quoting *Citizens Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1013 (10th Cir. 2002)). Therefore, the question before the Court is whether Defendants' application of a categorical exclusion to the 2008 AFA is arbitrary and capricious.

Plaintiffs contend that Defendants' action was arbitrary and capricious because they failed to conduct any analysis prior to applying the "programmatic" categorical exclusion to the 2008 AFA. This Court has previously ruled that an agency acts arbitrary and capriciously when it fails to conduct a contemporaneous analysis of whether a categorical exclusion applies to a particular agency action. *See Humane Soc'y v. Johanns*, 520 F. Supp. 2d 8, 33-36 (D.D.C. 2007); *see also Fund for Animals, Inc. v. Espy*, 814 F. Supp. 142, 149 (D.D.C. 1993) (finding a NEPA violation where "the record reveals no contemporaneous consideration by the administrative decisionmaker of the applicability of the categorical exclusion"). Defendants contend that the record shows that they conducted the required analysis.

The record shows that Defendants did not formally invoke the categorical exclusion for the 2008 AFA as they had done previously for the 2005 AFA. Defendants note that the "Categorical Exclusion" document prepared in 2004 contemplated that there may be "subsequent AFAs" with similar terms. This, however, is not sufficient under NEPA, as the statute requires that the agency contemporaneously invoke a categorical exclusion with respect to each action it undertakes. *See Humane Soc'y*, 520 F. Supp. 2d at 33. There is evidence in the record that in April 2007, the DOI's Office of the Solicitor concluded that the categorical exclusion was applicable to a new proposed AFA with the CSKT for fiscal years 2007-08. The memorandum

from the Office of the Solicitor contains no detailed analysis or explanation other than to refer

back to the prior categorical exclusion and state that "[t]he result holds for the current AFA as

well." The only other evidence in the record showing that the agency considered the issue is in

its response to an inquiry from Congressman John Dingell in early 2008 regarding whether

NEPA applies to the AFA process. Agency correspondence shows that officials relied on the

NEPA analysis conducted for the prior AFA. In its formal response letter, the agency asserted

that the 2008 AFA falls within the categorical exclusion for "routine operations, maintenance,

and management." Defendants argue that this record evidence demonstrates that FWS

adequately considered whether the 2008 AFA fit a categorical exclusion prior to signing the

agreement in June 2008.

Plaintiffs argue, however, that this evidence does not establish compliance with NEPA

because it does not show that Defendants considered whether there were any "extraordinary

circumstances" that might render the categorical exclusion inapplicable. The DOI policies in

effect at the time stated that "[a]ny action that is normally categorically excluded must be

subjected to sufficient environmental review to determine whether it meets any of the

extraordinary circumstances, in which case, further analysis and environmental documents must

be prepared for the action." 69 Fed. Reg. at 10876. Defendants concede that the record does not

show an analysis of any extraordinary circumstances, but they argue that there is no legal

requirement that such consideration be documented. *See* Defs.' Reply at 37-38. In *Humane*

*Society*, this Court found that the Food Safety Inspection Service ("FSIS"), a unit within the U.S.

Department of Agriculture, had failed to comply with NEPA regulations because, although

USDA had determined that FSIS's programs were categorically excluded, the agency had ignored

its ongoing obligation to consider whether extraordinary circumstances existed such that the challenged action may have a significant environmental effect. 520 F. Supp. 2d at 33-36. The regulation in that case required the FSIS to "continue to scrutinize [its] activities to determine continued eligibility for categorical exclusion." *Id.* at 31 (quoting 7 C.F.R. § 1b.3(c)). Because the Court found that there was no evidence in the record that the agency had considered the applicability of the categorical exclusion, it did not reach the question of precisely how much consideration NEPA requires. *See id.* at 33-34. Unlike in *Humane Society*, there is some evidence in the record that DOI officials considered the applicability of the categorical exclusion for the 2008 AFA, but the record fails to show whether the agency considered the possibility that there were extraordinary circumstances that might require further environmental assessment.

In *California v. Norton*, 311 F.3d 1162 (9th Cir. 2002), the Ninth Circuit concluded that "[i]n many instances, a brief statement that a categorical exclusion is being invoked will suffice." 311 F.3d at 1176. However, the court found that where "there is substantial evidence in the record that exceptions to the categorical exclusion are applicable," there is a "heightened" need for adequate justification. *Id.*; *see also Wilderness Watch & Pub. Employees for Envtl. Responsibility v. Mainella*, 375 F.3d 1085, 1095 (11th Cir. 2004) ("Documentation of reliance on a categorical exclusion need not be detailed or lengthy. It need only be long enough to indicate to a reviewing court that the agency indeed considered whether or not a categorical exclusion applied and concluded that it did. . . . In most instances, a short statement that a categorical exclusion has been invoked will suffice to assure a reviewing court that environmental effects have been considered.") Because extraordinary circumstances are, by definition, extraordinary, it would be inappropriate to require an agency, as a general rule, to document its consideration of

them.  However, this Court agrees that where there is substantial evidence in the record that an

extraordinary circumstance might apply, an agency may act arbitrarily and capriciously by failing

to explain its determination that a categorical exclusion is applicable.  *See, e.g.*, *Brady Campaign*

*to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 17 (D.D.C. 2009) (holding that agency's

failure to consider reasonably foreseeable impacts of agency action is sufficient to render the

agency's invocation of a categorical exclusion arbitrary and capricious).  The question, then, is

whether there is substantial evidence in the record that an extraordinary circumstance applies

with respect to the 2008 AFA.

Plaintiffs argue that there is ample evidence in the record to advise Defendants that the

AFA may have significant impacts on public health or safety, refuge lands and other ecologically

significant or critical areas, or endangered species, thus establishing an extraordinary

circumstance.  *See* 516 DM 2, App. 2 (codified at 43 C.F.R. § 46.215) (listing extraordinary

circumstances).  Plaintiffs point to the following evidence in the record:

- FWS found that in 2005, under the previous AFA, only 41% of the Activities performed by the CSKT under the AFA were rated as successful.  *See* AR at 1137 (Calendar Year 2005 Report on Implementation of AFA at NBRC).

- In the Biology Program, 9 out of 26 required Activities were rated as unsuccessful in 2005, with 6 more rated as "needs improvement."  *Id.* at 1138.  FWS found that some Activities were not initiated in a timely manner and some were not performed by qualified personnel.  *Id.*

- In the Fire Program, FWS found that only one of three required prescribed burns was completed in 2005, due in part to poor planning.  *Id.* at 1139.

- In the Maintenance Program in 2005, "[s]everal of the highest priority Activities, such as those that influence public health and long-term maintenance of vehicles and heavy equipment, were not completed at a satisfactory level."  *Id.* at 1139.

- FWS found that in 2006, several of the highest priority Activities in the Maintenance Program were not completed at a satisfactory level, including those that influence wildlife health and safety, habitat management and the long-term maintenance of vehicles, equipment and infrastructure, interior fence maintenance, and bison husbandry. *See* AR at 2520 (Calendar Year 2006 Report on Implementation of AFA at NBRC).

- FWS found that the CSKT had failed to maintain electric fences at proper voltage, allowing bison to escape from a grazing unit and resulting in the death of one bison cow who was attacked by other bison while entangled in the fence. *See id.* at 2610-11.

- FWS found that the CSKT had significantly underfed 64 surplus bison that were being confined pending transfer to other NWRS units in October-December 2006. *See id.* at 2618-33 (2006 Report, Addendum C). According to FWS Project Leader Steven W. Kallin, the CSKT's underfeeding of bison "clearly justified the need for the FWS to cancel the CSKT's bison feeding responsibility, and feed these bison using FWS staff, in order to properly prepare these bison for the stress of their pending relocation." *Id.* at 2632-33.

- Ultimately, FWS withdrew the CSKT's authority to extend performance under the expired FY 2006 AFA and terminated negotiations for a FY 2007 AFA, directing the CSKT to cease performing all activities at the NBRC under the AFA. *See* AR 2429-39 (12/11/2006 Letter from J. Mitch King, Regional Director to James H. Steele, Jr.). FWS stated that the reasons for the withdrawal and termination included the CSKT's failure to: comply with FWS bison management standards, meet FWS wildlife monitoring and reporting standards, complete biological study plans, and maintain safe conditions for employees and the public. *Id.* at 2432-33.

*See Blue Goose* Pls.' Mem. at 48-49. Plaintiffs also point to the fact that the 2008 AFA expanded the CSKT's role in the management of the NBRC. Therefore, Plaintiffs argue that it is foreseeable based on the record that the CSKT's management of the NBRC under the 2008 AFA may have a significant impact on the NBRC.

Defendants argue that any concerns about the CSKT's future performance based on past operational problems is speculative and therefore need not be considered in their NEPA analysis. However, as this Court explained in *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F.

Supp. 2d 1 (D.D.C. 2009), "NEPA requires an agency to consider environmental impacts even if the effects are not entirely certain." *Id.* at 22. Moreover, the cases cited by Defendants in support of their "speculation" argument are inapposite. Defendants cite *Kleppe v. Sierra Club*, 427 U.S. 390 (1976), and two other cases for the proposition that "NEPA does not require agencies to evaluate impacts that are speculative." Defs.' Mem. at 36. In actuality, *Kleppe* and these other cases stand for the very different principle that an agency need not consider environmental impacts when its own action is speculative or hypothetical. That is, the question in those cases was not whether the environmental impacts of a particular action were speculative, but rather, whether the agency was, in fact, going to take a particular action in the future. *See, e.g.*, *Kleppe*, 427 U.S. at 408-09 (holding that an EIS was not required where there was no evidence in the record that the agencies were contemplating a proposal for a major federal action with respect to the region at issue). Defendant also cites *Glass Packaging Institute v. Regan*, 737 F.2d 1083, 1092-94 (D.C. Cir. 1984), for the proposition that NEPA does not require consideration of environmental effects caused by the "criminal acts of third parties." Defs.' Mem. at 36. The Court does not find that case analogous to the situation here, where the agency is entrusting certain duties to an entity whose prior authority to act in a similar manner was revoked due to performance problems.

The CSKT dispute Plaintiffs' characterization of its performance under the 2005 AFA and argue that past performance is not necessarily an indicator of how it would perform under the 2008 AFA. The CSKT point out that they were not given an opportunity to respond to FWS's allegations about its performance prior to the termination of the AFA. They also contend that the allegations were made by FWS employees who opposed the AFA and had a motive to make the

33

CSKT look bad.  Therefore, they contend that the evidence in the record of the CSKT's mismanagement of the NBRC does not present an extraordinary circumstance warranting further environmental review.  However, the persuasiveness of the evidence in the record as to the CSKT's performance is not a question for this Court to decide in the first instance.  FWS might have reasonably concluded that the allegations of the CSKT's poor performance were speculative and thus could be disregarded for purposes of NEPA.  Such a decision would be afforded great deference under the APA.  But there is no evidence in the record that the agency made any such conclusion.  Instead, it appears that the agency reflexively applied its prior analysis without considering the fact that it had terminated the prior AFA due in part to the CSKT's performance.  The agency's failure to explain its application of a categorical exclusion, in light of substantial evidence in the record of past performance problems by the CSKT, is arbitrary and capricious.  Accordingly, the Court finds that Defendants' adoption of the 2008 AFA violates NEPA.

      C.     *Remedy for NEPA Violation*

The remedy for Plaintiffs' NEPA claim is governed by the APA, which provides that the reviewing court shall "*hold unlawful and set aside* agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2) (emphasis added); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-14 (1971) ("In all cases agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements.")  "Pursuant to the case law in this Circuit, vacating a rule or action promulgated in violation of NEPA is the standard remedy."  *Humane Soc'y*, 520 F. Supp. 2d at 37 (citing *Am. Bioscience, Inc. v.*

*Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001)).  Thus, having found that Defendants violated

NEPA in entering into the AFA without properly considering its potential environmental impact,

the default remedy is to set aside Defendants' action, thereby rescinding the 2008 AFA.

However, the Court is not without discretion: "The decision whether to vacate depends on

the seriousness of the order's deficiency . . . and the disruptive consequences of an interim

change that may itself be changed."  *Advocates for Hwy. & Auto Safety v. Fed. Motor Carrier*

*Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005) (quoting *Allied-Signal, Inc. v. U.S. Nuclear*

*Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).  The CSKT argue that rescission of

the AFA is not an appropriate remedy because the parties have a long-term contractual

relationship, the disruption of which would have deleterious effects on operations at the NBRC.

The cases cited by the CSKT in support of this proposition, however, are readily distinguishable.

In *Forelaws on Board v. Johnson*, 743 F.2d 677 (9th Cir. 1984), the court declined to vacate 20-

year contracts in the third year of their terms because of a statutory requirement that the contracts

be in place within 21 months; the court determined that injunctive relief to enforce NEPA could

not be reconciled with Congress's purpose in ensuring that contracts were in place.  *Id.* at 685-

86; *see also Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 541 (1987) (citing

*Forelaws on Board* as an example of "unusual circumstances" in which injunctive relief would

not be appropriate to remedy violation of environmental statute).  In *Wilderness Watch v. United*

*States Forest Service*, 143 F. Supp. 2d 1186 (D. Mont. 2000), the court declined to order the

removal of hunting and fishing lodges that were unlawfully constructed absent evidence that

there was imminent ongoing environmental harm from the structures. *Id.* at 1210-11.[6]

By contrast, this is not a case where "[t]he egg has been scrambled and there is no apparent way to restore the status quo ante." *See Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002) (remanding in lieu of vacating agency action where agency had already administered program disbursing large quantities of sugar to farmers who had already plowed under their crops). The CSKT have not provided compelling evidence that rescission of the AFA would be unduly disruptive to the operations of the NBRC. The functions performed by the CSKT under the AFA are tasks that would otherwise have to be performed by FWS. Indeed, FWS has previously taken over duties assigned to the CSKT, having done so when the prior AFA was terminated. The fact that there may be some costs or "field-level" effects associated with the rescission does not mean that there should be an exception from the default rule that arbitrary and capricious agency action be set aside. The Court also notes that Defendants did not address this issue in their briefs, suggesting that Defendants are not as concerned as the CSKT about the prospect of reassuming sole management responsibility for the NBRC.

Therefore, pursuant to 5 U.S.C. § 706, the Court shall order that 2008 AFA be set aside. Because the Court shall set aside the 2008 AFA as an arbitrary and capricious agency action, there is no need for the Court to consider Plaintiffs' requests for declaratory relief as to the invalidity of the 2008 AFA under federal statutes other than NEPA. Moreover, Plaintiffs have failed to show that a permanent injunction is required to redress the NEPA violation found by the

---

[6] The special circumstances present in the other cases cited by the CSKT are also not applicable here. *See, e.g.*, *Nat'l Org. for the Reform of Marijuana Laws v. U.S. Dep't of State*, 452 F. Supp. 1226, 1234-35 (D.D.C. 1978) (finding that the public interest did not support an injunction against U.S. participation in a Mexican program to spray herbicide on marijuana and poppy plants).

Court.  *See Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2761 (2010) ("If a less drastic remedy (such as partial or complete vacatur of [the agency's] deregulation decision) was sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction was warranted.").  Accordingly, the Court shall deny the parties' cross-motions for summary judgment with respect to all their other claims.

## IV.  CONCLUSION

For the reasons set forth above, the Court shall GRANT Plaintiffs' motions for summary judgment with respect to their claims that Defendants violated NEPA, deny Defendants' and Intervenor-Defendant's motions for summary judgment with respect to Plaintiffs' NEPA claims, and order that the 2008 AFA be set aside.  The Court shall deny the parties' motions for summary judgment with respect to all other claims in these actions.  An appropriate Order accompanies this Memorandum Opinion.

Date: September 28, 2009

_____/s/_____

**COLLEEN KOLLAR-KOTELLY**
United States District Judge
